J-S58045-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| KURTAVIUS JERMON SMITH | |
| Appellant | No. 1092 WDA 2014 |

Appeal from the Judgment of Sentence February 25, 2014
In the Court of Common Pleas of Fayette County
Criminal Division at No(s): CP-26-CR-0001172-2012

BEFORE:  GANTMAN, P.J., BENDER, P.J.E., and PLATT, J.*

MEMORANDUM BY GANTMAN, P.J.:                    **FILED MARCH 09, 2015**

Appellant, Kurtavius Jermon Smith, appeals from the judgment of sentence entered in the Fayette County Court of Common Pleas, following his jury trial conviction of third degree murder.[1]  We affirm.

The trial court opinion sets forth the relevant facts of this appeal as follows:

> The incident giving rise to this case occurred during the early morning hours of May 13, 2012 in Pershing Court located in Uniontown, Fayette County, Pennsylvania.  At approximately 4:45 a.m., Officer Jamie Holland of the Uniontown City Police Department was dispatched to the housing complex for a report of a male lying on the ground with possible gunshot wounds.  Officer Delbert DeWitt, who was also dispatched to the scene, had noticed a white

_____

[1] 18 Pa.C.S.A. § 2502(c).

_____

*Retired Senior Judge assigned to the Superior Court.

Jeep SUV leaving Pershing Court when he was entering it. The vehicle's headlights were off.

When Officer Holland arrived first, he observed a non-responsive male with a single gunshot wound to the head. The male was identified as Marlin Crawford (street name "Zeus")[2] [("Victim")] and was pronounced dead…. The cause of death was a gunshot wound to the head, which went through to his skull and brain. Two firearms, two cards with envelopes, and a red rose were found on [Victim]. The firearms were a .357 revolver with six live rounds in it located in [Victim's] pocket and a fully loaded 9mm Taurus semiautomatic pistol that was partially tucked underneath his right hip.

After receiving further information on the white Jeep's whereabouts, officers traveled to Millview Street in Uniontown. The Jeep was parked in an unnamed alley, and the hood was warm. An unidentified witness told the officers that he observed two males exit the Jeep and enter a residence at 20 Millview Street. The officers approached the residence and demanded that all occupants exit with their hands up. It took between five and ten minutes for the first occupant to exit the residence and an additional twenty minutes for [Appellant] and the final remaining occupant to exit.

[Appellant] was interviewed by Captain David Rutter, who read [Appellant] his **Miranda**[3] warnings. [Appellant] acknowledged his rights and waived them. When he was asked about the shooting, [Appellant] indicated that he had no knowledge of the shooting, the victim, or the white Jeep SUV in question. He was then escorted into a holding cell while other interviews were being conducted. While in the cell, [Appellant] asked to speak with Captain Rutter alone. After several exchanges with Captain Rutter while in the holding cell, [Appellant] was escorted back into the

_____

[2] In the transcripts of the different proceedings in this case, Victim's street name is also spelled "Zuss" and "Zues."

[3] **Miranda v. Arizona**, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

interview room approximately five hours after his initial interview.

[Appellant] was again read his *Miranda* warnings, which he again acknowledged and waived. [Appellant] told Captain Rutter that his girlfriend at the time, Kimberly Johnson, had been involved with [Victim], and he went to [Victim's] home in Pershing Court to confront him about the relationship the night before the shooting. [Appellant] said he was beating and kicking the front door, and that he and [Victim] exchanged gunfire. [Appellant] claimed [that he] fled the scene.

The next evening, [Appellant] said he was in Pershing Court and saw [Victim] on the street. He indicated that he walked over to [Victim] in order to confront him again. This time it had to do with negative remarks [Victim] allegedly made about [Appellant]. [Appellant] claimed that another African-American male got in between them and punched [Appellant] in the face. When [Appellant] jumped to his feet, he claimed that [Victim] fired shots at him, and he saw a gun on the ground, picked it up, and fired at [Victim] as [Appellant] ran away. [Appellant] said that he did not know if he had hit [Victim] because [Appellant] was running for his life. He claimed to have thrown the gun in a very specific area, but the officers were unable to locate it.

Meanwhile, Captain Rutter was aware of text messages that [Appellant] sent to Ms. Johnson, which included, "…ima kill him thats my [fucking] word," and he mentioned to [Appellant] these text messages would be used against him. [Appellant] remained in the holding cell where he was eventually charged in connection with the shooting.

On January 3, 2013, [Appellant] and his counsel volunteered another statement, and [Appellant] was interviewed again by Detective Donald Gmitter at the Fayette County District Attorney's Office. He was read his *Miranda* warnings, which he acknowledged and waived. [Appellant] said that on the evening in question a person named Paige Fairfax was driving the rented Jeep SUV. He had gone to a club in Morgantown, West Virginia, and then returned to [Jason] Miller's home on Millview Street.

- 3 -

Another individual named Deaundrey Fielder (street name "K-Dub") was with them and carried a 9mm semiautomatic firearm. [Appellant] and Fielder were dropped off at the entrance of Pershing Court in order to make a drug purchase. It was there that they had encountered [Victim] with some unidentified African-American males. [Appellant] and [Victim] exchanged words and a physical altercation between all of the men occurred. [Appellant] saw the gun fall out of one of the men's [waistbands] and took it. While he was leaving, he claimed to have heard shots but did not know who was shooting. He observed Fielder running towards [Victim] but [Appellant] admitted to firing some shots as he ran away.

Further, according to the latest statement: Fairfax picked up [Appellant] and Fielder, and [Appellant] claimed to have thrown the gun in an alley on Millview Street before purchasing drugs elsewhere and returning to Miller's home. Fielder then retrieved the gun and put it, the drugs, and a scale in the floorboard at Miller's house.

[Appellant] was ultimately charged with [c]riminal [h]omicide and [f]irearms not to be [c]arried without a [l]icense. On August 10, 2012, following a Preliminary Hearing before Magisterial District Judge Michael Metros, all charges were bound over to the Court of Common Pleas. Following his waiver of formal arraignment, [Appellant] filed an Omnibus Pretrial Motion, which was denied by the Honorable Gerald R. Solomon, Senior Judge on March 28, 2013.

(Trial Court Opinion, filed July 7, 2014, at 2-5).[4]

Following a full hearing on March 27, 2013, concerning Appellant's omnibus pre-trial petition for writ of *habeas corpus* and motion to suppress

---

[4] In its statement in lieu of an opinion, filed July 29, 2014, the trial court incorporated the content of this opinion and order denying Appellant's post-sentence motion as well as the suppression court's opinion, filed on July 15, 2014, in support of the order denying Appellant's omnibus pre-trial motion.

statements, the court denied relief. On February 10, 2014, a jury convicted Appellant of third degree murder and acquitted him of the firearms charge. The court sentenced Appellant on February 25, 2014, to eighteen (18) to forty (40) years' incarceration. On March 3, 2014, Appellant timely filed post-sentence motions, which the court denied on July 7, 2014. Appellant timely filed a notice of appeal on July 8, 2014. The court ordered Appellant to file a concise statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(b); and Appellant timely complied on July 9, 2014.

Appellant raises the following issues for our review:

> 1. [WHETHER] THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE AND THE LAW SINCE THE COMMONWEALTH DID NOT ESTABLISH MALICE AND WHETHER THE EVIDENCE WAS OTHERWISE INSUFFICIENT TO SUSTAIN THE VERDICT AS THE COMMONWEALTH FAILED TO PROVE THE CHARGE AGAINST APPELLANT BEYOND A REASONABLE DOUBT[?]
>
> 2. WHETHER THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE AND THE LAW SINCE THE COMMONWEALTH DID NOT ESTABLISH THAT APPELLANT DID NOT ACT IN JUSTIFIABLE SELF-DEFENSE; AND WHETHER THE COMMONWEALTH'S EVIDENCE WAS INSUFFICIENT TO PROVE OTHERWISE BEYOND A REASONABLE DOUBT?
>
> 3. WHETHER THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE AND THE LAW SINCE THE COMMONWEALTH DID NOT ESTABLISH THAT APPELLANT, IF HE DID NOT ACT IN JUSTIFIABLE SELF-DEFENSE, THAT APPELLANT ACTED UNDER SUDDEN AND INTENSE PASSION RESULTING FROM SERIOUS PROVOCATION FROM THE VICTIM AND THE DEGREE OF CRIMINAL HOMICIDE ONLY ROSE TO THE LEVEL OF VOLUNTARY MANSLAUGHTER OR INVOLUNTARY MANSLAUGHTER AND NOT TO THE LEVEL OF THIRD DEGREE [MURDER]?

4. DID THE COURT [ERR] IN DENYING APPELLANT'S OMNIBUS PRE-TRIAL MOTION[?]

5. DID THE COURT [ERR] IN PERMITTING THE POLICE OFFICER [TO TESTIFY] AS TO WHAT A CONFIDENTIAL INFORMANT DISCLOSED?

6. DID THE COURT [ERR] IN PERMITTING THE POLICE OFFICER [TO TESTIFY] ABOUT A BULLET HOLE THAT WAS ADMITTEDLY NOT PART OF THIS CRIME SCENE?

(Appellant's Brief at 8).[5]

In issues one through three, Appellant argues the Commonwealth failed to prove Appellant acted with malice, a necessary element of third degree murder. Specifically, Appellant contends the Commonwealth presented no evidence that Appellant was "the shooter." Appellant also states without any developed argument that the verdict was against the weight of the evidence because his actions were justified and/or in self-

---

[5] The body of Appellant's brief contains a duplicate issue #5, presented as follows: Did the court [err] in permitting the police officer [to testify] as to what witnesses, Christopher Teets and Ms. Johnson stated in an unsubstantiated note and through unsubstantiated texts? This duplicate issue #5 was raised in Appellant's post-sentence motion, and the court addressed the claim in its July 7, 2014 opinion at page 15 (reasoning that statements in question were not hearsay; Ms. Johnson appeared at trial as Commonwealth's witness and authenticated text messages taken from her phone; Appellant authored and sent those text messages, so texts were Appellant's own statements; likewise, note obtained from Mr. Teets was sent to Mr. Teets from Appellant and was in Appellant's own handwriting). This duplicate issue #5, however, was not raised in Appellant's Rule 1925(b) statement or listed in the formal "Statement of Questions Involved" (Appellant's Brief at 8) in violation of Pa.R.A.P. 2116(a). Therefore, this duplicate issue #5, concerning the texts and the note, is waived; and we give it no further attention.

defense. Appellant submits the Commonwealth's evidence was insufficient to establish third degree murder, and the jury's verdict was likewise against the weight of the evidence. Appellant concludes he is entitled to an acquittal or, in the alternative, a new trial. We disagree.

This Court has observed:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [finder] of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

The following principles apply to our review of a weight of the evidence claim:

> The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. An appellate court cannot substitute its judgment for that of the finder of fact. Thus, we may only reverse the...verdict if it is so contrary to

the evidence as to shock one's sense of justice.

Moreover, where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence. Rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim.

The Crimes Code defines murder as follows:

**§ 2502.  Murder.**

(a)    Murder    of    the    first    degree.—A    criminal homicide constitutes murder of the first degree when it is committed by an intentional killing.

(b)    Murder    of    the    second    degree.—A    criminal homicide constitutes murder of the second degree when it is committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony.

(c)    Murder of the third degree.—All other kinds of murder shall be murder of the third degree. Murder of the third degree is a felony of the first degree.

\* \* \*

18 Pa.C.S.A. § 2502(a)-(c).  To establish the offense of third degree murder, the Commonwealth need only prove beyond a reasonable doubt that the defendant killed an individual, with legal malice, *i.e.,* …wickedness of disposition, hardness of heart, wantonness, cruelty, recklessness of consequences, or a mind lacking regard for social duty.  …  Malice is established where an actor consciously disregard[s] an unjustified and extremely high risk that his actions might cause death or serious bodily harm.

**Commonwealth v. Devine**, 26 A.3d 1139, 1145-46 (Pa.Super. 2011),

*appeal denied*, 615 Pa. 783, 42 A.3d 1059 (2012) (most internal citations

- 8 -

and quotation marks omitted). We also observe: "A weight of the evidence claim concedes that the evidence is sufficient to sustain the verdict, but seeks a new trial on the ground that the evidence was so one-sided or so weighted in favor of acquittal that a guilty verdict shocks one's sense of justice." *Commonwealth v. Lyons*, 622 Pa. 91, 116, 79 A.3d 1053, 1067 (2013), *cert. denied*, ___ U.S. ___, 134 S.Ct. 1792, 188 L.Ed.2d 761 (2014).

Instantly, Appellant's conclusory argument devoted to issues one through three is inadequately developed, although liberally seasoned with legal citations. Therefore, we could deem issues one through three waived on that basis alone. *See generally Commonwealth v. Palo*, 24 A.3d 1050, 1057-58 (Pa.Super. 2011), *appeal denied*, 613 Pa. 663, 34 A.3d 828 (2011) (emphasizing need for developed, reasoned, intelligent argument appropriate for appellate review; otherwise, issue is subject to waiver). With respect to Appellant's second and third issues only, he makes no argument and cites no relevant law in his brief to support self-defense, voluntary manslaughter, or involuntary manslaughter. Thus, Appellant waived issues two and three on this basis as well.

Moreover, the Commonwealth produced evidence at trial for each element of third degree murder. As the trial court stated:

### Third Degree Murder

\* \* \*

In the instant case, the Commonwealth presented a myriad of evidence that a reasonable jury could have properly convicted [Appellant] of Third Degree Murder. First, the Commonwealth had the text messages sent by [Appellant] to Ms. Johnson. [Appellant] admitted to the police that he was upset that Ms. Johnson, who was [Appellant's] girlfriend at the time, was also involved with [Victim]. One of the text messages [Appellant] sent to Ms. Johnson said, "Lmao…then you told this nigga where im at? Bitch yur way too much right now! Ima kill him that's my [fucking] word." That message was sent on May 12, 2012 at 5:28 p.m., less than 12 hours before [Victim's] body was found.

Second, [Appellant] changed his version of events three (3) different times. When Captain Rutter initially interviewed him, [Appellant] indicated that he had no knowledge of the shooting and had never heard the names "Zeus" or "Marlin Crawford" in his life. [Appellant] also gave a detailed description as to his whereabouts at the time of the shooting.

Several hours later, [Appellant] gave Detective Rutter a different version of events. This time, [Appellant] said that he knew [Victim], and he was very upset that Ms. Johnson was 'messing with [Victim]." [Appellant] then gave the version of the story where he went to [Victim's] home the night before the shooting in order to confront him, and the two men exchanged gunfire. The two men encountered each other the following evening, and a physical altercation ensued with other unaffiliated parties. The altercation ended with more gunfire, and [Appellant], who picked up a gun off the street, returned fire as he was running away. [Appellant] did not know if he hit [Victim], and [Appellant] claimed to have thrown the gun in a specific location, which the police were unable to locate. When asked why he threw the gun, [Appellant] responded, "Because I knew what I had done."

Several months after the shooting, [Appellant] voluntarily came in for questioning at the District Attorney's Office and gave an entirely different version of events to Detective Gmitter. [Appellant] told the story of riding in the white Jeep in question to Pershing Court with Fairfax

and Fielder in order to purchase drugs. [Appellant] and [Victim] encountered each other, and [Appellant] attempted to "squash the bad blood between them." A physical altercation ensued with unaffiliated parties, and [Appellant] picked up a gun from the ground and began running. [Appellant] claimed to have heard shots but was unsure of who the shooter(s) was (were) when he fired back while still running. All [Appellant] observed was Fielder running towards [Victim] with a gun. [Appellant] then claimed that Fielder asked [Appellant] why he threw the gun, and Fielder retrieved it and hid it in a floorboard at Miller's house. [Appellant] had no justification for not calling the police after this had occurred.

Third, the Commonwealth presented a letter that [Appellant] had written to a friend from prison where [Appellant] pleaded with her to present a false account of his whereabouts on the night of the shooting.

Commonwealth witness Diana Long had received a letter from [Appellant] that read in relevant part:

> I got my situation under control and the table is starting to turn around now. My lawyer will be coming to see you very soon. I need you to write this down and remember it and tell him when he comes. I came in your house a little bit after two−two a.m., you let me in and went back to sleep. You woke up at four a.m., heard the TV, came down and turned it off. At this time, I was still on the floor sleeping, and went back to sleep after you turned the TV off. I will call you soon to make sure you got this letter.
> Miss you very much. Love always.

This version of events was never conveyed to police by [Appellant] in any of the three (3) times he spoke with them regarding this case.

Fourth, the Commonwealth presented both a conversation between [Appellant] and Gerald Secrest and a letter written by [Appellant] to Secrest.

Secrest described the first conversation as follows:

[Appellant] was reading the paper after a young male was shot here in Uniontown and he said about, you can't be a porch nigger, you got to be a real nigger. His situation, as soon as he seen the guy, he shot him…. He said about him, another fellow and his girlfriend went that night and shot [Victim].

[Appellant] also wrote Secrest a letter from prison, which read:

What's up? This is Tay. I want to know what Chris Teets tell you about my case and why is he trying to take my life away? Whatever he said, he is lying. I never talked to him about my case. He came to me once on C block and asked me if I wanted him to help with my case, and I said no, I am good because I know he worked for the police. The only thing that I told him was the truth, that my life was in danger and I didn't do it. I could have been dead right now with my mom crying because her baby child is gone, but God protected me. That's why I pray to him even right now for keeping me safe. I am thanking him for protecting me. I am not that type of person. The boy, Craig rug, on C block told me Chris told him that he is going to set me up because I slapped him when I caught him stealing out of my cell. So, please don't do nothing to take my life.

Finally, Secrest testified to a conversation he overheard between [Appellant] and Teets where [Appellant] "asked [Teets] to be an alibi for him. [Appellant] was willing to pay [Teets]."

The decedent was killed by a gunshot to the head. There is ample circumstantial evidence to show that [Appellant] had motive, opportunity, and actually did fire the fatal shot. The jury was not required to believe any of [Appellant's] self-serving statements.

Based on this evidence, it was reasonable that the jury found that the Commonwealth met its burden of proof for a Third Degree Murder conviction.

### *Self-defense*

Next, [Appellant] argues that the Commonwealth could not prove that [Appellant] did not act in justifiable self-defense when [Appellant] shot [Victim].

Under Pennsylvania law:

**[§ 505.  Use of force in self-protection**

\*    \*    \*

**(b)   Limitations on justifying necessity for use of force.—**

\*    \*    \*]

(2) The use of deadly force is not justifiable under this section unless the actor believes that such force is necessary to protect himself against death, serious bodily injury, kidnapping or sexual intercourse compelled by force or threat; nor is it justifiable if:

(i)  the actor, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter; or

(ii) the actor knows that he can avoid the necessity of using such force with complete safety by retreating, except the actor is not obliged to retreat from his dwelling or place of work, unless he was the initial aggressor or is assailed in his place of work by another person whose place of work the actor knows it to be.

\*    \*    \*

18 Pa.C.S.A. § 505(b)(2)

In the instant case, the Commonwealth presented sufficient evidence to refute that [Appellant] acted in justifiable self-defense.   First, …[Appellant] gave law enforcement officials three (3) different versions of what

happened on that night. Two (2) versions included [Appellant] throwing away the gun, and one established that [Appellant] was the initial aggressor since he claimed to have confronted [Victim]. Second, [Appellant] sent a text message saying that he was going to kill [Victim]. Third, [Appellant] asked different individuals to lie on his behalf.

Based on this evidence, the jury could have found that [Appellant] was the initial aggressor, that he was not actually in fear, and that he failed to retreat.

### *Voluntary and Involuntary Manslaughter*

[Appellant] argues that the Commonwealth may have been able to establish his conduct rose to the level of Voluntary or Involuntary Manslaughter but not Third Degree Murder.

Under the law, Voluntary Manslaughter is defined as follows:

**[§ 2503.  Voluntary manslaughter**

**(a)   General rule.—]**A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:

(1) the individual killed; or

(2) another whom the actor endeavors to kill, but he negligently or accidentally causes the death of the individual killed.

18 Pa.C.S.A. § 2503(a).

The Pennsylvania Superior Court further analyzed the statute:

"Passion" includes any emotions of the mind that render it incapable of reflection, such as anger, rage, sudden resentment or terror. Once it is found that the defendant was confronted with sufficient provocation,

- 14 -

the focus shifts to the defendant's response: did the defendant actually act in the heat of passion when he committed the homicide; did the provocation directly lead to the killing of the person responsible for the provocation, or was the individual killed negligently or accidently in the course of the defendant's endeavor to kill his provoker; and was there insufficient "cooling time," thus preventing a reasonable [person] from regaining his capacity to reflect.

***Commonwealth v. Galloway***, 485 A.2d 776, 783 (Pa.Super. 1984) (other citations omitted).

Furthermore, a person can be guilty of Voluntary Manslaughter for what is known as "imperfect self-defense":

**[§ 2503.  Voluntary manslaughter**

\* \* \*

**(b)  Unreasonable belief killing justifiable.—]**A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify the killing under Chapter 5 of this title (relating to general principles of justification), but his belief is unreasonable.

18 Pa.C.S.A. § 2503(b).

Here, the jury was not persuaded by any possible testimony regarding a killing in the heat of passion or "imperfect self-defense."  [Appellant's] different versions of events, the text message, and asking others to lie for him all refute that argument.

Furthermore, any argument that [Appellant] was angry over an alleged affair between his girlfriend and [Victim] also fails because even if it could be deemed adequate provocation, [Appellant] had a more than sufficient cooling period since the killing took place more than 24 hours after he was made aware of the alleged affair.

- 15 -

> For these reasons, it was reasonable for the jury to find [Appellant] did not commit Voluntary Manslaughter.
>
> As to [Appellant's] argument regarding Involuntary Manslaughter, the [c]ourt finds this argument fails as well.
>
> Under the law, "A person is guilty of involuntary manslaughter when as a direct result of the doing of an unlawful act in a reckless or grossly negligent manner, or the doing of a lawful act in a reckless or grossly negligent manner, he causes the death of another person." 18 Pa.C.S.A. § 2504(a).
>
> With the evidence that was presented to the jury, it was reasonable for them to find that [Appellant] was much more culpable than merely reckless or negligent when he shot [Victim] in the head.

(Trial Court Opinion at 6-13) (most internal citations omitted). Even if Appellant had properly preserved and presented issues one through three, we would conclude the Commonwealth presented sufficient evidence for the jury to find, beyond a reasonable doubt, that Appellant had fired the gun which killed Victim, and Appellant did so with a hardness of heart or recklessness of consequences. *See* 18 Pa.C.S.A. § 2502; *Devine, supra*. Given the trial evidence, we would likewise see no reason to disturb the court's decision to deny relief on Appellant's weight claim. *See id. See also Lyons, supra*.

Appellant's fourth issue concerns his omnibus pre-trial motion to suppress statements he made to the police. Initially, Appellant asserts the police arrested him without a warrant. Appellant then avers the police failed to advise him of his *Miranda* rights when he was first arrested, he did not

understand those rights when he finally received **Miranda** warnings, and he was incapable of waiving those rights. Appellant claims he did not voluntarily and understandably waive his rights or make statements to the police. Appellant claims Captain Rutter played on Appellant's emotions by telling Appellant the crime scene would be tainted if Appellant did not hurry up and give his version of the events; if it was self-defense, Appellant should say so or the police could do nothing for Appellant. Appellant insists Captain Rutter knew Appellant did not want to talk about the incident, but Captain Rutter pushed Appellant for a response. Appellant concludes the court should have suppressed Appellant's statements under these circumstances, and we should grant him a new trial. We disagree.

We review the denial of a suppression motion subject to the following principles:

> Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct.
>
> [W]e may consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the court erred in reaching its legal conclusions based upon the facts.

**Commonwealth v. Hope Williams**, 941 A.2d 14, 26-27 (Pa.Super. 2008) (*en banc*) (internal citations and quotation marks omitted). Further, "It is

within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony." ***Commonwealth v. Clemens***, 66 A.3d 373, 378 (Pa.Super. 2013) (quoting ***Commonwealth v. Gallagher***, 896 A.2d 583, 585 (Pa.Super. 2006)).

Additionally:

> Statements made during custodial interrogation are presumptively involuntary, unless the accused is first advised of [his] ***Miranda*** rights. Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. The ***Miranda*** safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. Thus, interrogation occurs where the police should know that their words or actions are reasonably likely to elicit an incriminating response from the suspect. In evaluating whether ***Miranda*** warnings were necessary, a court must consider the totality of the circumstances. In conducting the inquiry, we must also keep in mind that not every statement made by an individual during a police encounter amounts to an interrogation. Volunteered or spontaneous utterances by an individual are admissible even without ***Miranda*** warnings.

***Hope Williams, supra*** at 30 (internal citations and quotation marks omitted).

In response to this issue, the suppression court offered the following:

### FINDINGS OF FACT

1. On May 13, 2012, Officer Matthew Painter of the Uniontown Police department responded to the scene of an unresponsive male and observed a single gunshot wound to the male's forehead.

2. As Patrolman Delbert [DeWitt] arrived on the scene,

- 18 -

he observed a white Jeep SUV pull out with its headlights turned off.

3. Chief Jason Cox, who also responded to the scene, was given information by a confidential informant that the shooter possibly had a nickname of "Tay," was seen in a white Jeep, and was staying at 20 Millview Street.

4. Chief Cox patrolled the area looking for a white Jeep and found it in an alley north of Millview Street.

5. Together with other officers, Chief Cox proceeded to 20 Millview Street and, using a [P.A.] system, had the occupants, including Appellant, exit the home.

6. Captain David Rutter of the Uniontown Police department responded to the crime scene and interviewed Appellant at 9:17 [a.m.] that same morning.

7. Appellant, who did not appear to be under the influence of drugs or alcohol, was given his *Miranda* rights by Captain Rutter and acknowledged that he understood his rights.

8. Appellant then executed a rights waiver form.

9. The waiver of his rights was made voluntarily, knowingly and intelligently by Appellant.

10. Appellant then made a statement in which he denied knowing the victim, Marlon Crawford, and that he had never heard the name "Zuss" in his life.

11. On May 13, 2012, Captain Rutter, who is certified to conduct such test, completed a gunshot residue kit on the hands of Appellant.

12. Later that day, at 3:04 [p.m.], Appellant was again advised of his *Miranda* rights and again executed a rights waiver form.

13. No threats, promises or other improper incentives were made to Appellant to cause him to waive his rights and make a statement.

14. The waiver of his rights was made voluntarily, knowingly and intelligently by Appellant.

15. Appellant then made a second statement in which he stated that he confronted Zuss regarding Appellant's girlfriend and that they exchanged gunshots before Appellant fled.

16. Appellant further stated that the next night he again confronted Zuss, and that Zuss pulled a gun and started shooting at [Appellant], causing Appellant to pick up a gun lying on the grounds and fire it at Zuss as Appellant was running away.

17. During the interview of Appellant, Rutter advised [Appellant] that the police had text messages from him to Kim Johnson.

18. With regard to the text messages, Appellant stated to Rutter that the text "looks pretty bad" and asked if there was "any way to make them go away."

19. Trooper Donald Lucas, of the Pennsylvania State Police, was given a cell phone to examine regarding this matter and downloaded the available data from the phone.

20. The telephone number for the cell phone was 724-963-2340.

21. On May 12, 2012, the phone received a message from "Tay" stating, "bitch, you fuckin' Zuss, oh you nasty bitch, you let him nut in you, then let me fuck, you a slut."

22. Another message was received from "Tay" that day stating, "omg bitch, I know you didn't let him drive my car. I fuckin' hate you."

23. A third message from "Tay" was received by the same telephone that day stating, "lmao, then you told this nigga where I'm at. Bitch you are way too much right now. Ima kill him. That's my fucking word."

\* \* \*

The omnibus pretrial motion of Appellant…contended that Appellant did not knowingly, intelligently and/or voluntarily waive his right to self-incrimination. Instantly, Appellant made two incriminating statements, both on May 13, 2012. Captain David Rutter of the Uniontown Police Department, after he had responded to the crime scene, interviewed Appellant at 9:17 [a.m.] that morning. Appellant, who did not appear to be under the influence of drugs or alcohol, was given his *Miranda* rights by Captain Rutter and acknowledged that he understood his rights. He then executed a rights waiver form and made an incriminating statement. Later that day, at 3:04 [p.m.] while still in custody, Appellant was again advised of his *Miranda* rights, again executed a rights waiver form and made a second incriminating statement. No threats, promises or other improper incentives were made to Appellant to cause him to waive his rights and make this second statement.

The only evidence offered at the omnibus pre-trial hearing was that the waiver of [Appellant's] *Miranda* rights was made voluntarily, knowingly and intelligently by Appellant, and we so found.

(Suppression Court Opinion, filed July 15, 2014, at 2-5, 9) (internal citations omitted). We see no reason to disturb the suppression court's decision to deny relief on this issue. *See Hope Williams, supra*; *Clemens, supra*.

In his fifth issue, Appellant asserts the Commonwealth offered, for the truth of the matter asserted, Chief Cox's testimony regarding information he received from a confidential informant ("CI") that Appellant was the shooter. Appellant avers this testimony was the only information that supposedly linked Appellant to the crime. Appellant claims the Commonwealth should have disclosed the identity of Chief Cox's CI. Appellant complains the Commonwealth led the trial court to believe the only reason the

- 21 -

Commonwealth wanted to use information obtained from the CI was to develop how the police learned where the white Jeep seen leaving the crime scene could be found. Appellant insists the court told the Commonwealth before trial that it could not offer information from the CI to name Appellant as the shooter, and nothing happened at trial to change the court's ruling. Appellant contends the CI was not present at trial or subject to cross-examination, so anything the CI reported was inadmissible hearsay. Appellant concludes the erroneous admission of Chief Cox's testimony warrants a new trial. We disagree.

Initially, we observe:

> Regarding the disclosure of a confidential informant, the Pennsylvania Supreme Court has stated:

>> [N]o fixed rule with respect to disclosure of the confidential informant's identity is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders the nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony and other relevant factors.

> *Commonwealth v. Bing*, 551 Pa. 659, 663–64, 713 A.2d 56, 58 (1998) (internal brackets and citations omitted). Further:

>> This balance is initially weighted toward the Commonwealth, which holds a qualified privilege to maintain an informant's confidentiality to preserve the public's interest in effective law enforcement. However, the balance tips in favor of disclosure

> where guilt is found solely on police testimony from a single observation and testimony from a disinterested source, such as the informant, is available.

***In re R.S.,*** 847 A.2d 685, 688 (Pa.Super. 2004), *appeal denied*, 581 Pa. 679, 863 A.2d 1148 (2004) (quoting ***Commonwealth v. Belenky***, 777 A.2d 483, 488 (Pa.Super. 2001)).

"However, where other corroboration of the officer's testimony exists, disclosure of the informant's identity is not necessarily required." ***Bing, supra*** at 664, 713 A.2d at 58. Moreover, a defendant must meet certain thresholds for the court to determine whether to order the disclosure of an informant's identity:

> Before the informant's identity may be revealed…the accused must show the information is material to the defense and the request is reasonable. The defendant need not predict exactly what the informant will say, **but [the source] must exonerate [the defendant]. More than the mere assertion that disclosure of the informant's identity might be helpful is necessary.** Only after this threshold showing that the information is material and the request is reasonable is the trial court called upon to determine whether the information is to be revealed.

***In re R.S., supra*** at 688 (emphasis added).

Where the confidential informant is not a witness to the incident at issue, the defendant must show that the Commonwealth's disclosure of the identity of the informant is (1) material to his defense; (2) reasonable; and (3) in the interests of justice.

> It is important to note that the Rule [Pa.R.Crim.P. 305B(2)(d)] speaks in terms of a showing **by the defendant.** These conditions cannot be assumed, and they must be supported by evidence on the record. It is in this context that the evidence

- 23 -

presented at the hearing must be examined to determine whether the defendant met his burden.

***Commonwealth v. Hritz****,* 663 A.2d 775, 778 ([Pa.Super.] 1995) (quoting ***Commonwealth v. Novasak****,* 606 A.2d 477, 483 ([Pa.Super.] 1992), *appeal denied,* 532 Pa. 662, 616 A.2d 984 (1992)) (internal citations and footnote omitted) (emphasis in original).

Regarding the element of materiality, the defendant must show as a threshold matter that the informant's identity is germane to the defense. ***Commonwealth v. Heater****,* 899 A.2d 1126, 1130 (Pa.Super. 2006), *appeal denied,* 592 Pa. 779, 926 A.2d 973 [] (2007). Evidence is "relevant and material to the defense if it tends to show that a specific crime of which a defendant stands accused was committed by someone else." ***Novasak, supra****.* The record must disclose a reasonable possibility that the information sought will **materially aid** the defendant in presenting his defense and is not obtainable from another source. ***Hritz, supra*** at 780 (emphasis in original).

***Commonwealth v. King***, 932 A.2d 948, 952-53 (Pa.Super. 2007).

Pennsylvania Rule of Evidence 801 defines hearsay as follows:

**Rule 801. Definitions That Apply to This Article**

**(a) Statement.** "Statement" means a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion.

**(b) Declarant.** "Declarant" means the person who made the statement.

**(c) Hearsay.** "Hearsay" means a statement that

(1) the declarant does not make while testifying at the current trial or hearing; and

(2) a party offers in evidence to prove the truth of the matter asserted in the statement.

Pa.R.E. 801.

> The hearsay rule provides that evidence of a declarant's out-of-court statements is generally inadmissible because such evidence lacks guarantees of trustworthiness fundamental to the Anglo–American system of jurisprudence. [T]he focus of the Confrontation Clause is testimonial hearsay. However, when a hearsay statement is offered for a purpose other than proving the truth of its contents, it is not hearsay and is not excludable under the hearsay rule. [T]he [Court in **Crawford v. Washington**, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)] makes clear that even the use of testimonial statements is not barred by the Confrontation Clause for purposes other than establishing the truth of the matter asserted. In any event, it is a long standing rule of jurisprudence that an out-of-court statement offered to explain a course of conduct is not hearsay.

**Commonwealth v. Dargan**, 897 A.2d 496, 500 (Pa.Super. 2006), *appeal denied*, 591 Pa. 671, 916 A.2d 1101 (2007) (most internal citation ans quotation marks omitted). **See also Commonwealth v. Johnson**, 615 Pa. 354, 386, 42 A.3d 1017, 1035 (2012), *cert. denied*, ___ U.S. ___, 133 S.Ct. 1795, 185 L.Ed.2d 818 (2013) (quoting **Commonwealth v. Rega**, 593 Pa. 659, 693-94, 933 A.2d 997, 1017 (2007), *cert. denied*, 552 U.S. 1316, 128 S.Ct. 1879, 170 L.Ed.2d 755 (2008) (stating: "[A]ny out-of-court statement offered not for its truth but to explain the [witness'] course of conduct is not hearsay)); **Commonwealth v. Smith**, 378 A.2d 1015, 1017 (1977) (stating trooper's testimony in bookmaking prosecution, concerning informant's statement that trooper could place bets by calling specific telephone number, was not hearsay, as it was offered to explain trooper's subsequent actions; statement was not offered to show it was true, but only that it was said).

Instantly, on the fourth day of the jury trial, the court convened an "in camera" proceeding to determine whether to disclose the identity of Chief Cox's CI. Chief Cox testified that the CI had provided reliable information to the police over the past six or seven years, that there were few CIs in Pershing Court, and that the culture and atmosphere of the environment would result in physical threats and physical harm to the CI, if his identity were disclosed. The jury heard none of this testimony. In response to this claim, the trial court said:

> Appellant argues that the [c]ourt erred in allowing testimony regarding what the [CI] disclosed to the police. The [c]ourt is unclear of [Appellant's] argument here because there is no testimony presented in front of the jury on the CI. An "in camera" proceeding was held with Chief Jason Cox and Detective Gmitter. The [c]ourt did not require the Commonwealth to reveal the identity of the CI due to credible threats to [the CI's] personal safety. …
>
> *     *     *
>
> Here, [Appellant] did not meet the threshold which required disclosure of the CI. Chief Cox had conveyed the CI's statements to Detective Gmitter in the very early stages of the investigation. That information led police to [Appellant], but based on what additional evidence revealed, the investigation would have led police to [Appellant] regardless of whether a CI was involved.
>
> The [c]ourt found that the threats against the CI were credible since Pershing Court is one of the highest crime areas in the county, and the [c]ourt has presided over innumerable violent criminal cases [which] have occurred there. The [c]ourt is also aware that police experience great difficulty obtaining information from witnesses to these crimes due to fear of and/or actual threats of bodily harm or death. The Defense did not demonstrate a genuine need for the CI's identity, and there was a

legitimate reason to continue to withhold that information.

(Trial Court Opinion at 13-14) (most internal citations omitted). We see no reason to disturb the trial court's decision to deny disclosure of the identity of the CI.

Regarding Chief Cox's trial testimony, nothing in the record indicates Chief Cox was permitted to identify Appellant as the shooter based on information obtained from the CI. At trial, the following took place away from the jury:

### SIDE-BAR CONFERENCE

DEFENSE COUNSEL: Much of Chief Cox's testimony could be hearsay, and I am going to ask the [c]ourt to—well, I want to make a note that I will be objecting to hearsay and I want to do it before the jury hears it.

COMMONWEALTH: I don't believe that there is any hearsay, Judge. The substance of Chief Cox's testimony is that once receiving information of the white Jeep, he received information from a confidential informant that the Jeep could be at 20 Millview Street, and he responded to that location and in fact found the Jeep, so I think that that is just a part of the *res gestae*. It is not being offer[ed] for the truth. It is just why he went to 20 Millview.

DEFENSE COUNSEL: Your Honor, in additional to that, in Chief Cox's statement, he said that there was other information that is incriminating, which…includes the fact that the defendant was in the white Jeep, and that it was at the scene.

COMMONWEALTH: The specific information received from the confidential informant was that Tay and K-Dub were involved and they left in a white Jeep and they were at 20 Millview Street.

DEFENSE COUNSEL: And that is hearsay.

COMMONWEALTH: And it was based on that information that he went to 20 Millview Street and found both the white Jeep and the occupants.

THE COURT: Well, in the absence of an identification of [the] confidential informant, you can't use that information at all other than to say that [the police] learned of the location of the white Jeep and they went to 20 Millview, and anything that led up to that at this point is hearsay unless you come up with another way to get it in.

COMMONWEALTH: Okay.

DEFENSE COUNSEL: Thank you, Your Honor.

(**AT THIS TIME, THE SIDE-BAR CONFERENCE WAS CONCLUDED**)

(N.T. Trial, 2/3/14, at 63-64). The substance of Chief Cox's testimony before the jury was limited to his course of investigation and is, in relevant part, as follows:

COMMONWEALTH: Chief, back on May 13, 2012, were you on duty?

WITNESS: I was not.

COMMONWEALTH: Did you have the occasion to investigate the matter before the [c]ourt on that date?

WITNESS: I did.

COMMONWEALTH: Can you tell us how you came involved in that investigation?

WITNESS: At approximately five a.m., I had received a phone call at home that there had been a shooting in the area of Pershing Court and that a male had a gunshot, an apparent gunshot to the head and he was in grave condition.

COMMONWEALTH: Upon receiving that call, did you respond to the crime scene?

WITNESS: I did.

COMMONWEALTH: What time did you arrive?

WITNESS: At approximately 5:20.

COMMONWEALTH: And, can you tell me what you encountered upon your arrival there?

WITNESS: Um, when I arrived, [Victim] had already been taken from the scene, and I began to speak with the officers to gather as much intel as possible to determine a potential suspect.

COMMONWEALTH: In your speaking to any officers and/or other sources, did you get any information that you used to investigate?

WITNESS: I did. I received information that the shooter had…

DEFENSE COUNSEL: Objection.

THE COURT: Sustained. At this point, we discussed…

COMMONWEALTH: Let me ask…

WITNESS: Yes, sir.

COMMONWEALTH: After speaking to other officers and other sources, you were aware that there was a white Jeep seen at the scene, correct?

WITNESS: Yes, sir.

COMMONWEALTH: Did you go about investigating the white Jeep?

WITNESS: I did.

COMMONWEALTH: And, after the investigation, did you receive any information as to where the…

DEFENSE COUNSEL: Objection.

THE COURT: Did you locate the white Jeep?

WITNESS: Yes, sir.

COMMONWEALTH: Where did you locate the white Jeep?

WITNESS: In an unnamed alley north of Millview Street.

COMMONWEALTH: Upon locating the Jeep, what did you do?

WITNESS: I requested the assistance of other officers.

COMMONWEALTH: Did other officers arrive at the scene in the unnamed alley by Millview Street?

WITNESS: Yes, sir.

COMMONWEALTH: What other officers were there?

WITNESS: I believe Officer Painter, Officer Fidazzo, Officer Miller at some point, and I don't remember [in] which order they arrived.

COMMONWEALTH: Did you check to see—did you check the hood or anything to see if it had been running recently?

WITNESS: I did. I felt the hood and it appeared to be warm. It felt warm.

COMMONWEALTH: Once the other officers arrived on the scene, what steps did you take?

WITNESS: The Jeep was parked at the rear of basically like a garage apartment, so the first step we took

was to knock on the door of that garage apartment. I knocked on that door, encountered a male, I asked if that was his Jeep and he advised it was not. I then asked if he knew whose Jeep it was and he said that he did not, but that a short time prior to our arrival, he observed the Jeep pull up and two individuals exited and walked…

DEFENSE COUNSEL: Objection to hearsay.

THE COURT: Yeah. There is no hearsay [exception] that I have heard to justify the chief repeating what he was told by a witness that is not testifying.

COMMONWEALTH: Understood, Your Honor.

COMMONWEALTH: After speaking to the guy in the garage, what did you do at that point, Chief?

WITNESS: At that point I—myself and the officers went to the area of 20 Millview Street.

COMMONWEALTH: What did you do—strike that. First off, where is that in relation to the unnamed alley where you observed the Jeep at?

WITNESS: South.

COMMONWEALTH: Not that far away?

WITNESS: Less than a block.

COMMONWEALTH: And, upon going to 20 Millview, what did you do?

WITNESS: We arrived at 20 Millview and stationed officers on the compass points of 20 Millview Street. At that point, I utilized a bullhorn to order any individuals that were inside of 20 Millview Street in the third floor apartment out.

COMMONWEALTH: What specifically did you say?

WITNESS: At that point, I believed that my initial verbiage towards the apartment was any occupants on the

third floor of 20 Millview Street, please exit with your hands up.

COMMONWEALTH: And, did you receive any response to that command?

WITNESS: After some time, yes.

COMMONWEALTH: Approximately how long after?

WITNESS: Maybe between five and ten minutes

COMMONWEALTH: And what was the response that you got?

WITNESS: One individual exited the residence.

COMMONWEALTH: Were you able to identify that person?

WITNESS: Yes, sir.

COMMONWEALTH: Who was it?

WITNESS: His name is Jasson Miller.

COMMONWEALTH: Was Mr. Miller secured when he came out of the residence?

WITNESS: Yes, he was.

COMMONWEALTH: Did anybody else come out of the residence?

WITNESS: A female and two males.

COMMONWEALTH: About how long after Mr. Miller came out?

WITNESS: I believe the female was the second to come out, and then probably within twenty minutes or so, the other two males exited.

COMMONWEALTH: So, four occupants in the apartment altogether?

WITNESS:            Yes, sir.

COMMONWEALTH:   Were you able to identify the female when she came out?

WITNESS:            We were.

COMMONWEALTH:   And, who was she?

WITNESS:            I don't recall the name off the top of my head.

COMMONWEALTH:   What about the two males.

WITNESS:            They were identified as well.

COMMONWEALTH:   Do you recall who they were?

WITNESS:            Deaundrey Fielder and [Appellant], who is seated to the left of [defense counsel].

COMMONWEALTH:   Your Honor, I would ask the record to reflect that Chief Cox had identified [Appellant].

THE COURT:         The record will so reflect.

COMMONWEALTH:   So, Chief, how long of a timespan is this just to give us an idea from the time that Mr. Miller comes out until the time Mr. Fielder and [Appellant] come out?

WITNESS:            Approximately twenty minutes.

COMMONWEALTH:   And, at what point did the female come out?

WITNESS:            In between.  You know, maybe five to ten minutes into an announcing and requesting that all of the parties [exit] the residence.

COMMONWEALTH:   So, shortly after Mr. Miller?

WITNESS:            Yes.

COMMONWEALTH: In the five to ten minute span after you gave that initial command, did you give additional commands?

WITNESS: Yes. I gave commands throughout the duration probably every minute to two minutes.

COMMONWEALTH: And, that was similar to commands that you gave to all occupants before the four of them come out?

WITNESS: Yes, sir.

COMMONWEALTH: Hands up or something to that effect?

WITNESS: Yes, sir.

COMMONWEALTH: Once Mr. Fielder and [Appellant] came out, were they secured and taken into custody?

WITNESS: They were.

COMMONWEALTH: After the two males, that being Mr. Fielder and [Appellant], [came] out of the apartment and were secured, what did you observe on Millview Street?

WITNESS: If you could be a little more specific?

COMMONWEALTH: Once they were taken into custody, were they placed into a patrol vehicle?

WITNESS: Yes, they were all placed into patrol vehicles and transferred to the Uniontown Police Department.

COMMONWEALTH: Thank you, Chief.
COMMONWEALTH: That's all of the questions that I have for Chief Cox, Judge.

## CROSS EXAMINATION

DEFENSE COUNSEL: Chief, you say that there were four occupants of the house when you told them to come out of

the house; is that correct?

WITNESS: Yes.

DEFENSE COUNSEL: Okay. The first one was a person named Jasson Miller?

WITNESS: Yes.

DEFENSE COUNSEL: The second person that came out was a female?

WITNESS: Yes.

DEFENSE COUNSEL: You don't remember [her] name?

WITNESS: No, sir.

DEFENSE COUNSEL: Was it—would you remember if it was Ms. Fairfax?

WITNESS: Yes, it was.

DEFENSE COUNSEL: And, her first name?

WITNESS: Jessica.

DEFENSE COUNSEL: It was Ms. Fairfax?

WITNESS: Yes, sir.

DEFENSE COUNSEL: Now, after that, Mr. Fielder and [Appellant] come out. Did [they] come out together?

WITNESS: I don't remember.

DEFENSE COUNSEL: And, do you remember Mr. Fielder?

WITNESS: Um, I may or may not.

DEFENSE COUNSEL: Was he taken into custody?

DEFENSE COUNSEL: Do you know whether either of the males, or any of the three males were in a relationship

- 35 -

with the female?

WITNESS:             I don't.

DEFENSE COUNSEL: Who owned the Jeep?

WITNESS:             I am not sure.

DEFENSE COUNSEL: Do you know who was driving the Jeep?

WITNESS:             I didn't observe anyone driving the Jeep.

DEFENSE COUNSEL: Okay.   In your information did you find out who had been driving?

WITNESS:             I did not.

DEFENSE COUNSEL: Did you find out who had been occupants in the car?

WITNESS:             I did not.

DEFENSE COUNSEL: Okay.  That's all I have.  Thank you.

COMMONWEALTH:   No redirect, Your Honor.

THE COURT:          You can step down Chief Cox.

WITNESS:             Thank you, Your Honor.

(N.T. Trial, 2/3/14, at 64-72).  As the trial transcript makes clear, there was no testimony presented in front of the jury on the CI's information that would constitute inadmissible hearsay.  Additionally, at no time did Chief Cox identify Appellant as the shooter, based on information obtained from the CI.  Therefore, nothing in the record indicates the jury verdict was compromised by inadmissible hearsay as Appellant has alleged.  Thus, this issue merits no

relief.

In his last issue, Appellant complains the court allowed evidence concerning a bullet hole near the crime scene that did not relate to the homicide at issue. Appellant insists the evidence was irrelevant to the charges against him. Appellant avers the bullet hole was placed more than a day before the homicide at issue. Appellant submits the evidence admitted was pure speculation in an attempt to bolster the Commonwealth's case with "outrageous information." Appellant concludes the court erred in admitting this evidence, which only clouded the matter and warrants relief. We cannot agree.

The general standard of review for admission of evidence is as follows:

> Admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion. Admissibility depends on relevance and probative value. Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact.
>
> *        *        *
>
> Judicial discretion requires action in conformity with law, upon facts and circumstances judicially before the court, after hearing and due consideration. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence or the record, discretion is abused.

*Commonwealth v. Levanduski*, 907 A.2d 3, 13-14 (Pa.Super. 2006) (*en banc*), *appeal denied*, 591 Pa. 711, 919 A.2d 955 (2007) (internal citations omitted). Relevance is the threshold for admissibility of evidence. *Commonwealth v. Cook*, 597 Pa. 572, 602, 952 A.2d 594, 612 (2008).

The Pennsylvania Rules of Evidence provide:

> **Rule 401. Definition of "relevant evidence"**
>
> "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Pa.R.E. 401. Rule 402 states:

> **Rule 402. General Admissibility of Relevant Evidence**
>
> All relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible.
>
> > *Comment:* Pa.R.E. 402 differs from F.R.E. 402. The Federal Rule specifically enumerates the various sources of federal rule-making power. Pa.R.E. 402 substitutes the phrase "by law."
> >
> > Pa.R.E. 402 states a fundamental concept of the law of evidence. Relevant evidence is admissible; evidence that is not relevant is not admissible. **This concept is modified by the exceptions clause of the rule, which states another fundamental principle of evidentiary law—relevant evidence may be excluded by operation of constitutional law, by statute, by these rules, by other rules promulgated by the Supreme Court or by rules of evidence created by case law.**
>
> \* \* \*

Pa.R.E. 402 (emphasis added). In other words, evidence that is relevant to an issue in a particular case can still be incompetent and therefore inadmissible because one or more established rules of evidence preclude its admission. *Id. See also Commonwealth v. Paddy*, 569 Pa. 47, 70–71, 800 A.2d 294, 308 (2002) (stating: "Evidence that is relevant may nevertheless be inadmissible if it violates a rule of competency…").

> Trial judges generally enjoy broad discretion regarding the admission of potentially misleading or confusing evidence. Trial judges also have the authority to exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice or confusion. Furthermore, the function of the trial court is to balance the alleged prejudicial effect of the evidence against its probative value, and it is not for an appellate court to usurp that function.

*Commonwealth v. Parker*, 882 A.2d 488, 492 (Pa.Super. 2005), *affirmed on other grounds,* 591 Pa. 526, 919 A.2d 943 (2007) (internal citations omitted).

Instantly, the Commonwealth offered into evidence a picture of the crime scene that showed a bullet hole near the crime scene from the day before the shooting. Ms. Robinson, who was Victim's girlfriend at the time of the homicide, testified that on the night before the shooting, she heard gunshots and she saw men running away from the scene. She said before that incident, she had not heard gunshots fired for as long as she could remember. Further, in his second written statement to the police, Appellant admitted he had exchanged gunfire with Victim the night before the

homicide and confronted him again on the night of the shooting. As a result, the trial court reasoned:

> Ms. Robinson, [Victim's] girlfriend, was shown photos of the crime scene that depicted two bullet entries into her home in Pershing Court. One of the bullet holes was from May 13, 2012, while the other was from May 12, 2012. Ms. Robinson testified that she heard a "loud commotion" on May 12 that included gunshots, but she was unable to identify any of the men involved. The [c]ourt permitted this testimony due to the close proximity of the shootings in this case and to demonstrate the amount of gunfire that occurs in Pershing Court on any given day.
>
> [Appellant] himself claimed in one of his statements that there was a shooting in this area on May 12.

(Trial Court Opinion at 16). The evidence served to dispel any possible argument that the bullet holes came from a firefight between Appellant and Victim in which Appellant was acting in self-defense. Instead, the homicide occurred during an ambush in which Appellant killed Victim. This bullet-hole evidence was therefore relevant and met the threshold requirement of admissibility. Moreover, the evidence was not so unduly prejudicial as to call the jury's verdict into question. Thus, we see no reason to disturb the court's decision to admit the bullet-hole evidence at trial. Based upon the foregoing, we affirm.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/9/2015